# EXHIBIT C

MARK D. HATTEN (SBN 00785949)
mhatten@shannongracey.com
SHANNON, GRACEY, RATLIFF & MILLER, LLP
420 Commerce Street, Suite 500
Fort Worth, TX 76102
Telephone: (817) 336-9333
Facsimile: (817) 336-3735

*Attorneys for Defendant, Universal Adcom, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS

| | |
|---|---|
| Bug Pro, LLC and Timothy M. Bunting, on behalf himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>UNIVERSAL ADCOM, LLC, and John Does 1 through 10,<br><br>Defendants. | Case No. 4:13-cv-646 JMM<br><br>AFFIDAVIT OF KEN SPONSLER |

1. I am the Vice President and General Manager of CompliancePoint DM, Inc. (CompliancePoint) with offices in Duluth, GA. CompliancePoint is a wholly owned subsidiary of PossibleNOW, Inc. I was contacted for the purposes of discussions regarding engagement as an expert witness by Mark D. Hatten of Shannon, Gracey, Ratliff & Miller, LLP, counsel for the Defendant, Universal Adcom, LLC, in the case Bug Pro, LLC and Timothy M. Bunting, on behalf himself and all others similarly situated, Plaintiff v. UNIVERSAL ADCOM, LLC, and John Does 1 through 10, Defendants, Case No. 4:13-cv-646 JMM, in the United States District Court for the Eastern District of Arkansas.

2. I have been engaged to provide opinions regarding: (a) `whether the telephone dialing equipment purportedly used to place calls to Bug Pro, LLC, Timothy M. Bunting, and others similarly situated constitutes an Automatic Telephone Dialing System, (b) whether

misleading or inaccurate caller identification information was used during those calls – both (a) and (b) as defined by the Telephone Consumer Protection Act of 1991, and (c) whether Defendant's sales call activities violated Federal and Arkansas Do Not Call requirements.

**My Summary of Opinions on Specific Issues Follows Below.**

3.  My fact-finding activities reveal that none of the five Universal Adcom contact centers employed an Automatic Telephone Dialing System at any time presently or in the past and that deceptive Caller ID information is not broadcast by any of these centers. Finally, Universal Adcom does not place outbound calls that are subject to the Telephone Consumer Protection Act or the Telemarketing Sales Rule's Do Not Call provisions.

**Materials reviewed and relied upon:**

4.  Plaintiff's First Amended Class Action Complaint, Motion for Summary Judgment, Affidavit of Sydney B. Hewlett (with exhibits), Affidavit of David Myers, Affidavit of Ryan Tadeo (with exhibit), Affidavit of Tony Perotti, Affidavit of Raleigh Long, The Telephone Consumer Protection Act, The Telemarketing Sales Rule, Web research at www.experts-exchange.com, fact finding interviews with Tony Perotti, Tech Electronics, technician for the St. Charles, MO office; Dave Myers, Intellicom, technician for the Peoria/Moline, IL offices; Raleigh Long, President ABC Telecom, technician for the former Ft. Worth, TX facility; and Ryan Tadeo, 1Voice Technology, technician for the Arlington, TX/Davenport, IA offices. Additional interview were conducted with David Fries, Peoria IL; Dana Murphy, Moline, IL; Antonio Miller, St. Charles, MO; Joe Dillard, Davenport, IA; Pam Thacker, Facility Director Ft. Worth, TX; Brandon Albertson, National Vice President Sales, from Universal Adcom's corporate office.

**Qualifications**

5.  I have over 13 years of operational experience in business to business and business to consumer global direct marketing compliance matters. I have personally conducted dozens of onsite compliance assessments, gap analyses, and risk assessment studies. I have assessed nume-

rous call center operations on behalf of potential seller-clients as a due diligence measure prior to sellers entering into contractual relationships for services. I have provided expert reports in several TCPA-related matters, including issues specifically related to identifying authorized users of mobile telephones. My parent company, PossibleNOW, Inc., is a provider of mobile telephone identity services. The company has maintained historical records of mobile telephone portability status since the beginning of U.S. portability implementation in late 2003. A true and correct copy of my CV is attached hereto as Exhibit A, which accurately reflects additional qualifications in connection with the opinions I have been asked to provide in this matter. Exhibit A was prepared by me based on my personal knowledge of the events and information recorded therein, as part of the regularly conducted business of CompliancePoint. Each new event or piece of information was added to Exhibit A by me based on my personal knowledge thereof or by an assistant to whom I transferred that information to be added, at or near the time of the event or information recorded, as part of the regularly conducted business of CompliancePoint. Exhibit A has further been maintained by CompliancePoint as part of its regularly conducted business. In addition to the publications identified in my CV, in the last ten years I published the article entitled "Data Privacy and Security Laws: Is Your Company at Risk?" in the November 2005 LOMA Resource Magazine. Since 2007, I have also published a monthly compliance article for customer distribution.

**Summary of Expert Experience**

6.     In the last five years, I have been qualified as an expert in Federal District Court, and have been retained to provide deposition testimony as an expert in the following matters: *Stephen M. Manno, et al. vs. Healthcare Revenue Recovery Group, LLC d/b/a Account Resolution Services, et al.*, an action filed in the United States District Court Southern District of Florida (Case No.: 11-61357); *United States of America, et al., v. Dish Network, LLC,* an action filed in the United States District Court for the Central District of Illinois (Case No.: 3:09-cv-03073); *Trilegiant Corporation v. Sitel Corporation*, an action filed in the United States District Court for the Southern District of New York (Case No. 1:2009-cv-06492); *ADT Security Services Inc., v. Security One International and SCELLUSALEADS,* a civil action filed in the United States

District Court Northern District of California (Case No. C 11-05149-YGR); *Jessica Lee, individually and on behalf of a class of similarly situated individuals, v. Stonebridge Life Insurance Company, et al.*, a civil action filed in the United States District Court For The Northern District Of California (Case No. C 11-0043 RS); and *Cory Horton, on behalf himself and all others similarly situated, v. Cavalry Portfolio Services, LLC,* a civil action filed in The United States District Court For The Southern District Of California (Case No. 3:13-cv-00307-JAH-WVG).

**Methodology**

7. In drafting this report and rendering my opinions in this case, I considered the case-related materials I reviewed, my knowledge of telephone dialer systems, as well as fact finding interviews. Defendant conducts its outbound and inbound customer contact operations through several centers. These are located in Peoria and Moline Illinois, St. Charles Missouri, Arlington, TX and Davenport Iowa. Defendant also operated a center in Fort Worth, Texas for a limited time during the class period. Fact finding discovery with Pam Thacker, former Ft. Worth facility Director, indicates that the center merged with the Arlington, Texas center in January 2013. I interviewed employees and service providers with first-hand knowledge of systems in operation at each center. The focus of my fact finding interviews was related to communications equipment, lead acquisition and management systems, Caller ID capabilities, sales agent training, dialing methodologies, Do Not Call policies and procedures, escalation policies, business operations and modeling, as well as corporate policy and procedure relative to Defendant's corporate and contact center locations.

**Terminology**

8. For the purposes of my opinions, I have defined terms used in this report as follows:

    a. **Automatic Telephone Dialing System**: The Telephone Consumer Protection Act provides that an Automatic Telephone Dialing System (ATDS) is defined as "equipment, which has the capacity to store or produce telephone numbers to be called,

using a random or sequential number generator, and to dial such numbers."(See 47 USC § 227(a) (1)).

b. **Capacity:** Under the TCPA, an ATDS is "equipment which has the **capacity** –

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

(B) to dial such numbers (47 U.S.C. § 227(a)(1)(A)).

To date, neither Congress nor the FCC has defined "capacity", leaving a void of much needed guidance as technology has advanced and modern systems have become more sophisticated. Despite not defining the term capacity, the FCC has at least recognized that capacity must be evaluated in the context of hardware as it is programmed with software (Federal Communications Commission, 2003, TCPA Order, p. 14091), i.e., if software is coupled with hardware that enables a system to meet the definition of an ATDS, then that system has the requisite capacity to be an ATDS under the TCPA. If that is the case, the opposite must then be true: if a system is not programmed with the software that enables it to be an ATDS, then it cannot have the capacity to be an ATDS. This is consistent with the FCC's stated determination that the purpose of evaluating capacity when making ATDS determinations is to ensure that the prohibition on autodialed calls is not circumvented. (Federal Communications Commission, 2003, TCPA Order, p. 14091)

c. **Predictive Dial Mode:** Predictive dial is one of several available methodologies that may be employed by modern dialer platforms. The technology "predicts" agent availability and live person connects. The system employs an adjustable algorithm to determine how many numbers to dial in order to make "X" percentage of live connects in conjunction with anticipated agent availability. The dialer may be configured to ignore fax tones, busy signals, answering machines, and no-connects while passing live person connects to the next available agent. The system maximizes cost per sale efficiencies by keeping agents busy with calls. The downside of the technology is

the likelihood of abandoning calls (connecting to a live person but not having an agent available within two seconds of the called person's greeting).

d. **War Dialing:** A technique of using a modem to automatically scan a list of telephone numbers, usually dialing every number in a local area code to search for computers, bulletin board systems, and fax machines. The popularity of war dialing in 1970s and 1980s prompted some states to enact legislation prohibiting the use of a device to dial telephone numbers without the intent of communicating with a person.

e. **Private Branch Exchange:** A private branch exchange (PBX) is a telephone exchange or switching system that serves an organization and concentrates office lines or trunks and provides intercommunication between a large number of telephone stations in the organization. The central office lines provide connections to the public switched telephone network and enables the shared use of these lines between stations in the organization. An intercommunication function can facilitate two or more stations to establish telephone or conferencing calls between them without using the central office equipment. Each PBX-connected station, such as a telephone set, a facsimile machine, or a computer modem, is often referred to an extension and has a designated extension telephone number that may or may not be mapped automatically to the numbering plan of the central office and the telephone number block allocated to the PBX.

9. **Summary of Opinions:** My review of the case-related materials, experience in telemarketing and Do Not Call compliance matters, including ATDS technology analysis and fact finding interviews contributed to my opinions.

a. **Opinion One:** Defendant did not employ, or cause to be employed, Automated Telephone Dialing Equipment in any of its contact center operations or by use of third parties at any time.

b. **Facts in Support:** The TCPA was signed into law nearly twenty-three years ago. Its purpose was to prevent unwanted or harassing telephone calls to consumers using

technology that was prevalent at the time. Telephone dialing equipment and technology in common use today was just emerging in 1991. "War dialing" was still commonly employed by many contact center operations. Consumer outcry spurned tougher laws, including ATDS limitations as well as Do Not Call laws. Eventually, 29 states maintained a Do Not Call list until the introduction of the National Do Not Call Registry in October 2003. Thirteen states currently still maintain a Do Not Call list.

In my experience within the contact center industry, most medium to large scale operations employ ATDS systems. However, due to the recent TCPA amendments requiring Prior Express Written Consent to call mobile telephones for solicitation purposes, an increasing number of contact centers now employ variations of "manual dial" systems for calls to mobile telephones in order to ensure compliance with the ATDS prohibitions. ATDSs and their manual dial variations are available from a wide variety of premise-based hardware and software platforms, as well as "cloud based" systems. (*See also* Affidavit of Tony Perotti, page 3, paragraphs 10 – 13; Affidavit of Ryan Tadeo, page 3, paragraph 13 – page 4, paragraph 15; Affidavit of David Myers, page 3, paragraph 12 – page 4, paragraph 15; and Affidavit of Raleigh Long, pages 3 and 4, paragraphs 10 through 14.)

Despite the wide availability of modern ATDS technology, my discovery activities reveal that Defendant does not possess, employ, or engage with others that employ any ATDSs. In fact, Defendant's sales agents place outbound calls by hand-dialing (pressing digits) on traditional desk telephones. Further, sales agents work from a printed (paper) calling list (radius sheet and call back sheet). The radius calling list represents businesses that are located within a radius of approximately five miles of a supported entity, such as police, fire, community, school, and so on. The radius list is assigned to each agent at the beginning of his or her shift. Agents also maintain a "call back sheet". The call back sheet consists of businesses that have asked for a call back regarding the products/services at a later time. Agents typically use a ruler to align the telephone number to be dialed with the business information on the sheets.

AFFIDAVIT OF KEN SPONSLER

To be clear, all of the Defendant's contact center operations, including St. Charles MO, Peoria IL, Moline IL, Davenport IA, Arlington TX, and Fort Worth, do (did) not employ ANY form of automated dialer functionality whatsoever. There is no system that randomly or sequentially generates numbers and no system to dial such numbers exists. The outbound sales agent dialing functionality is as basic and unsophisticated as it gets; agents press numbers on a desk telephone.

No computer software or hardware of any kind is a component of Defendant's outbound dialing operations. Defendant does not possess or utilize any hardware or software designed for telephone dialing automation.

Defendant is able to maintain very basic sales agent productivity reporting through the use of basic Station Message Detail Recording (SMDR) functionality that is available through the various PBX solutions employed at each contact center as identified in the chart below. Station message details include basic record keeping, such as date/time of call, number dialed, duration of call, agent non-productive time, extension number, etc.

The telephone equipment listed below is identified for each of Defendant's contact center locations.

| Location | PBX Equipment |
| --- | --- |
| St. Charles, MO | Mitel Axxess 5.353 |
| Peoria, IL | Mitel SX2000 Light |
| Moline, IL | Mitel SX200 Micro Light |
| Davenport, IA | Asterisk V 1.8.21.0 |
| Arlington, TX | Asterisk V 1.6.2.20 |
| Ft. Worth, TX (closed Jan 2013) | Nitsuko/NEC 384i |

(*See also* Affidavit of Tony Perotti, page 2, paragraphs 6 – 8; Affidavit of Ryan Tadeo, page 2, paragraph 9 – page 3, paragraph 11; Affidavit of David Myers, page 2, paragraph 8 – page 3, paragraph 10; and Affidavit of Raleigh Long, page 3, paragraphs 7 through 9.)

My personal discovery through interviews with each telephone vendor representative, contact center managers, as well as my reviews of affidavits, reveal that the telephone PBX equipment identified above is not associated with or connected to any automated telephone dialing software or any other automated telephone dialing capable system.

c. **Opinion Two:** Defendant did not manipulate Caller ID information, nor did Defendant use a Caller ID service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value.

d. **Facts in Support:** My discovery interviews, as well as impromptu Caller ID testing and industry knowledge combined with my understanding of the lines and equipment employed by Defendant, leads me to conclude no intentional or unintended alteration or programming of equipment or software has taken place resulting in false or misleading Caller ID information being transmitted by Defendant.

If calls from Defendant were displayed as "unknown" or "out of area" on Caller ID, as asserted in Plaintiffs' complaint, this is consistent with my understanding of the telephone lines and equipment employed by Defendant, and not as a result of any intentional manipulation to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm or wrongfully obtain anything of value. (*See also* Affidavit of Tony Perotti, page 4, paragraphs 14 – 17 (a) and page 5, paragraph 17 (b); Affidavit of Ryan Tadeo, page 4, paragraph 16 – 17 (b) and page 5, paragraph 17 (b) *continued* - paragraph 19; Affidavit of David Myers, page 4, paragraph 16 – 18 and page 5, paragraph 18 *continued* – paragraph 19; and Affidavit of Raleigh Long, pages 4 and 5, paragraphs 15 through 18.)

e. **Opinion Three:** Defendant exercised due diligence and industry standards of care relative to outbound calling activities, as well as best practices regarding Federal or Arkansas Do Not Call compliance.

f. **Facts in Support:** Defendant provides products specifically oriented for customer businesses to promote their services through support of client public entities and communities such as police, fire stations, schools, chambers of commerce, libraries etc. Customers from industries such as food service, banks, real estate, plumbing, and insurance have all utilized Defendant's promotional items, distributed through Defendant's clients, to advertise their business in their targeted market areas. Promotional items include a vast array of products that can accommodate promotional information, such as maps, calendars, community guides, cups, glasses, shopping bags, magnets, T-shirts, sports water bottles, and plates. Defendant has been manufacturing magnets, maps, and other promotional items for the purpose of business advertising since 1974.

Defendant's products or services are not intended for residential consumers. Defendant has no interest in obtaining residential telephone information or placing calls to non-businesses. Defendant's business is roughly comprised of 75-80% resale to current and former business customers and 20-25% to new businesses. Defendant purchases business contact information from InfoUSA. Defendant does not purchase residential information, nor has any interest in contacting consumers, since its products and services are focused entirely on business purchases of hundreds or even thousands of its customized promotional items. Discovery reveals consistently that all contact centers maintain a policy and procedure for identifying numbers associated with any calls inadvertently placed to non-businesses as "Do Not Call", in accordance with the process outlined below.

Even though Defendant's outbound sales calls are exempt from Federal and State Do Not Call laws, Defendant exhibits industry best practices by accepting and honoring requests to cease further calls. When sales agents become aware of a request that fur-

AFFIDAVIT OF KEN SPONSLER

ther calls cease, they inform their manager, who in turn emails or faxes the Do Not Call request information to the main office Customer Service Department in Arlington, Texas. This process was slightly different at the Ft. Worth, Texas center. Due to the fact that this center's location was only about 20 miles from the headquarters at Arlington, Texas, Do Not Call sheets were delivered by interoffice envelopes delivered by daily courier deliveries. The Arlington Customer Service Center inputs the business information into the Sales Tracking and Reporting System, so that any contact sheets or other documents generated for use by sales agents reflect the Do Not Call request for that business. However, as discussed earlier, due to Defendant's unsophisticated telephone and communications systems, fully implementing these requests across all contact centers can take time, which may result in a repeat call. The Telemarketing Sales Rule, as well as the Telephone Consumer Protection Act, allow for up to a 30 day grace period (DNC Safe Harbor) to honor Do Not Call requests for calls that are subject to the Do Not Call provisions (see *TCPA, 47 CFR § 64.1200(d)(3)*). While Defendant's calls were not subject to the Do Not Call provisions, the company has implemented a policy and practice to cease further calls to businesses that request it.

10. **Conclusions:** Defendant did not employ, or cause others to employ, an Automatic Telephone Dialing System as defined by the Telephone Consumer Protection Act at any time. Defendant employed manual dial outbound calls and agents dialed telephone numbers derived from a printed sheet of paper (radius list). Defendant did not manipulate Caller ID information, nor did Defendant use a Caller ID service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value. Finally, Defendant's business is oriented solely on business to business sales. Business to business calls are not subject to Do Not Call rules. While Defendant may rarely inadvertently contact a private consumer, no solicitation of any product or service takes place, therefore, the call is not for solicitation purposes. Defendant exerts due diligence and intentions to comply, as

well as employs industry best practices through its policies and practices to honor business Do Not Call requests, as well as reporting any inadvertent residential contacts as Do Not Call.

**Statement of Compensation**

11. I have spent approximately 20 hours studying this matter and preparing this report. My estimated compensation thus far is $8,000.00. My hourly rate for providing testimony will be $400 per hour. My compensation is not dependent upon the outcome of this matter.

**Reservation of Right to Amend**

12. I reserve the right to amend this report based on information received after issuance of the same. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and this declaration was executed on this 7th day of August, 2014, at Duluth, Georgia.

_____
Ken Sponsler

# EXHIBIT A

# Curriculum Vitae

Kenneth R. Sponsler, CIPP/US, PMP
CompliancePoint
4400 River Green Parkway, Suite 100
Duluth, GA 30096
(770) 255-1020
www.compliancepoint.com
ksponsler@compliancepoint.com

**Current Employment:**
Vice President and General Manager of CompliancePoint, DM Inc., Duluth, GA, a subsidiary of PossibleNOW. CompliancePoint is a global professional services firm specializing in consumer contact compliance consulting and audit services.

**Education:**
120 hours of undergraduate study; 4.0 GPA (no degree conferred) University of Maryland; City College of Chicago; Troy State University.

**Registrations, Licenses, Certifications:**
- Certified Information Privacy Professional (CIPP/US) by the International Association of Privacy Professionals (IAPP).
- Certified American Teleservices Association Self-Regulatory Organization Auditor (ATASRO).
- Certified Project Management Professional (PMP) by the Project Management Institute.

**Specialized Training:**
- U.S. Army Command Sergeant Major Course; First in Class.
- Advanced Non-Commissioned Officers' Course; Distinguished Graduate.

**Professional Experience:**
Thirteen years of general consultation practice concerning U.S. federal and state telemarketing operational compliance with a variety of national and global companies. Provides regulatory and operational compliance consulting services for telemarketing, email, mail, fax, SMS/text communications, and debt collection matters. Ken Sponsler has been designated as an "expert" in U.S. Federal District Court and provided expert opinions in numerous TCPA and TSR-related matters. CompliancePoint specializes in seller and telemarketer compliance, call center operations, compliance assessments, audits, and forensic call and call abandonment data analysis, with a focus on operational assessments, risk identification, gap analy-

sis, and implementation of compliance policies, procedures and strategies. Ken Sponsler's consulting practice includes seller/service provider relations, contracting, record keeping, training, monitoring, and enforcement. Additionally, he has provided consulting services to government and military organizations implementing U.S. Army modularity design and organizational changes. A retired U.S. Army Command Sergeant Major, he concluded his career as the Senior Enlisted Leader of the 3rd Infantry Division, leading a 23,400 man elite combat team.

Publications and Webinars (including CompliancePoint products):
- *2013 Compliance Review - 2014* Forecast, *Regulatory Updates*, Feb 2014
- *Strategies For Compliance With New TCPA Requirements*, March 2012
- *Employment Placement Verification*, February 2012
- *2011 Compliance Legislation Review & 2012 Forecast*, January 2012
- *Proven Audit & Business Process Techniques For Compliance*, June 2011
- *Risk In Admissions & Financial Aid Practices*, October 2010
- *What Impacts Will The TCPA Changes Have On Your Business?* Feb 2012
- *Periodic Regulatory Information Charts*
- *Monthly Regulatory Information Charts.*

Awards/Honors:
- PACE 2014 Chairman's Award for Distinguished Leadership and Service to the Industry, awarded by Professional Association of Customer Engagement.
- Technovation Award 2010, awarded by American Teleservices Association.
- Hewlett Packard Vendor of the Quarter Award (to CompliancePoint), 2007
- 18 separate personal awards by the U.S. Army, including the Legion of Merit.

Memberships:
- *American Teleservices Association* (now PACE)
  - Member, National Board of Directors
  - Member, Self-Regulatory Organization Trustee
  - Federal Legislative Committee Member
  - State legislative Committee Member
  - "Do Not Call" Implementation Committee Member
  - Compliance Officer's Forum Member
- *Professional Association of Customer Engagement, Southeast Chapter*
  - Member, Board of Directors
- *International Association of Privacy Professionals*
  - Consumer Marketing Working Group
- *Direct Marketing Association*
  - Teleservices Committee Member

**Presentations and Colloquies:**

Frequent speaker at industry events, including PACE Annual Convention; Direct Marketing Association Teleservices Conference; College of Information Assurance Professional's Governance; Risk and Compliance Summit; Noble User's Conference, Quarterly Compliance Focused Webinar Presentations.